**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Young Ho KIM, Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jeong Suk KIM, Defendant–Appellant.**

Nos. 93–10108, 93–10110.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 11, 1994.

Submission Vacated May 10, 1994.

Resubmitted Aug. 25, 1994.

Decided Aug. 23, 1995.

Jerry A. Ruthruff, Honolulu, HI, for defendant-appellant Young Ho Kim.

Renee M.L. Yuen, Renee M.L. Yuen, A Law Corp., Honolulu, HI, for defendant-appellant Jeong Suk Kim.

Florence T. Nakakuni, Asst. U.S. Atty., Honolulu, HI, for plaintiff-appellee.

Before: ALDISERT,\* WIGGINS, and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

Appellants Young Ho Kim and Jeong Suk Kim appeal their convictions for conspiracy to "structure" cash transactions in violation of the Currency Transaction Reporting Act. *See* 18 U.S.C. § 371; 31 U.S.C. § 5324(a)(3). The Act makes it illegal to structure transactions—i.e., break up a single cash transaction above the reporting threshold into two or more separate transactions—for the purpose of evading a requirement that financial institutions file reports with the Secretary of the Treasury for all cash transactions in excess of $10,000. 31 U.S.C. § 5324. "A person willfully violating" this provision is subject to criminal penalties. 31 U.S.C. § 5322. We reverse the Kims' conviction and remand to the district court for further proceedings.

## I. Facts and Proceedings

Young Ho Kim and his wife Jeong Suk Kim ("Mr. and Mrs. Kim," collectively the "Kims") came to the United States from Korea in 1977. The first job they held was selling puka shell jewelry from a cart in Waikiki. In the following ten years they bought and sold various retail interests and eventually expanded their operations to three stores located at the Hyatt Regency Hotel. In the course of business the Kims frequently handled large sums of cash and had deposited amounts in excess of $10,000 on more than one occasion.

Despite these large transactions, the Kims were never asked for information necessary to file a Cash Transaction Report ("CTR") until February 17, 1987, when a report was filed on a transaction of slightly less than $10,000. According to his testimony, Mr. Kim believed the decision to file such a report was within the discretion of the banker.

Over the years Mr. and Mrs. Kim had received large sums of money brought from Korea by Mrs. Kim's aunt, Mrs. Park. Mrs. Park had not reported the cash either in Korea or in Honolulu, apparently because she was concerned about her visa if the Korean government learned of the cash. The Kims used some of the money to help in their business. Shortly after a recent trip to Honolulu in which Mrs. Park brought approximately $78,000, she stated her desire to take all of her money, in the form of a check, to Japan to purchase something.

On February 19, 1987, Mr. Kim took $95,000 to his bank and saw Kenrick Chee ("Mr. Chee"), a bank manager with whom Mr. Kim was on friendly terms. Mr. Kim wanted to purchase a cashier's check, but told Mr. Chee he did not want the bank to file a large currency report in the process. Mr. Chee agreed to help Mr. Kim, and assisted him in

---

\* Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit Court of Appeals, sitting by designation.

purchasing three separate $10,000 checks by taking $9,900 in cash and a $100 business check written by Mr. Kim to each of three different tellers, so that no single transaction would be for $10,000 or more in cash. The drafts were made payable to Mr. Kim or "Granamoli," which apparently refers to a male friend of Mrs. Park. Mr. Chee similarly converted the remaining $65,000 on later days.[1] Mr. Kim then took the ten cashier checks and $5,000 cash to another bank branch and purchased a single $100,000 cashier's check. That draft was eventually taken to Japan and negotiated by Mrs. Park's friend. After Mrs. Park decided not to purchase anything, the funds were wired back to the Kims' K & K International business account.

Mr. Chee's superiors learned of the transactions and an investigation led to Mr. Chee's resignation under threat of termination. The bank later filed more than one hundred CTR's that should have been filed for earlier transactions, including some for large transactions by the Kims before February 1987. There is no allegation of impropriety on Mr. Kim's part with regard to these transactions.

In April of 1987 and June of 1988, the Kims were interviewed by Internal Revenue Service and Federal Bureau of Investigation agents about the February 1987 transaction. On February 12, 1992, Mr. Chee and Mr. and Mrs. Kim were indicted for (1) structuring a transaction in order to evade the currency reporting requirements, in violation of 31 U.S.C. § 5324(3),[2] (2) attempting to cause and causing a financial institution to file a false or materially misleading CTR, in violation of 31 U.S.C. § 5324(a)(2), and (3) conspiracy to commit the substantive offenses alleged, see 18 U.S.C. § 371. Mr. Chee pleaded guilty to one count of structuring in exchange for the other counts being dropped, and testified against the Kims. Mr. and Mrs. Kim were convicted by a jury of the conspiracy count and acquitted of the substantive structuring count. They timely appeal.

## II. Jury Instructions

Appellants challenge the district court's jury instructions regarding the mens rea requirement for conspiring to structure a transaction. The challenge focuses on the meaning and application of "willfully" as found in the relevant statute. See 31 U.S.C. § 5324. At the time of trial, the Ninth Circuit interpretation of this statute did not require a defendant to be actually aware that structuring transactions is illegal in order to be convicted. See United States v. Hoyland, 914 F.2d 1125, 1129–30 (9th Cir.1990). Following this interpretation, the district court's instruction regarding the mens rea requirement for the underlying offense stated that "[t]o act 'willfully' as the term is used in Title 31, United States Code 5324, means to act with the intent to prevent a bank from reporting a currency transaction of more than $10,000."

■ Shortly after oral argument of this appeal, however, the Supreme Court reversed this court's interpretation of the statute, concluding that, "to give effect to the statutory 'willfulness' specification, the Government [must] prove [the defendant] knew that the structuring he undertook was unlawful." Ratzlaf v. United States, ___ U.S. ___, ___, 114 S.Ct. 655, 658, 126 L.Ed.2d 615 (1994). In other words, the defendant's awareness, "not only of the bank's duty to report cash transactions in excess of $10,000, but also of his duty not to avoid triggering such a report," is now an element of the substantive crime. Id. at ___, 114 S.Ct. at 662; see also United States v. Weems, 49 F.3d 528, 531 (9th Cir.1995).

The decision in Ratzlaf is significant in this case because the district court did not instruct the jury that knowledge of the illegality of structuring is required to convict on either the substantive offense or the straight

---

1. The testimony of Mr. Kim differs from Mr. Chee's regarding whose idea it was to arrange the transaction in this manner.

2. 31 U.S.C. § 5324(a)(3) provides, in relevant part, "[n]o person shall, for the purpose of evading the reporting requirements ... structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one of more domestic financial institutions."

conspiracy charge. The jury convicted the Kims only on the conspiracy charge. Since *Ratzlaf* addressed only the mens rea of the substantive offense, we must decide in this case whether the Supreme Court's holding regarding the intent required for the substantive offense of structuring applies equally to the charge of conspiracy. We requested supplemental briefing on the effect of *Ratzlaf* on this issue.

In its supplemental briefs, the Government argues that the conspiracy instructions satisfy the requirements of *Ratzlaf* because they require knowledge by the defendants that their actions were unlawful. The instructions stated that the defendant must be found to know of, and intend to further the "unlawful purpose" of the conspiracy. The Government also argues that the use of "willfully" in the conspiracy instructions sufficiently meets the intent requirement of *Ratzlaf*.

■ We reject the Government's arguments. The use of "willfully" in the conspiracy instruction refers to the joining in the agreement, not the mens rea of the substantive offense. Moreover, the reference to knowledge of the unlawful purpose of the conspiracy does not instruct the jury to explicitly find knowledge of the illegality of structuring. While the court's instructions regarding the elements of the conspiracy offense were generally unobjectionable, they necessarily refer to the erroneous definition of the substantive offense embodied in the substantive offense instructions, which failed to mention a requirement of proof that the defendants knew that structuring a transaction was illegal. The jury therefore erroneously based its determination of guilt solely on whether the transactions were arranged to avoid reporting, not whether the defendant was actually aware such avoidance was illegal. This failure to properly instruct the jury of the knowledge requirement in the underlying offense resulted in an error in the conspiracy instruction.

■ That analysis is supported by the law. It is well-established in this circuit that "the requisite intent necessary to commit [the] underlying, substantive offense," is an essential element of any conspiracy. *United*

*States v. Schmidt,* 947 F.2d 362, 367 (9th Cir.1991) (quoting *United States v. Melchor-Lopez,* 627 F.2d 886, 890 (9th Cir.1980)). An error in construing the requisite intent for the underlying offense infects the intent for the conspiracy count. *See Ingram v. United States,* 360 U.S. 672, 681, 79 S.Ct. 1314, 1320-21, 3 L.Ed.2d 1503 (1959) (holding that lack of knowledge of a tax liability meant that defendants could not be convicted of conspiracy to evade taxes); *Direct Sales Co. v. United States,* 319 U.S. 703, 711, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943) (stating that "[w]ithout the knowledge, the intent cannot exist," and that "charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning ... a dragnet to draw in all substantive crimes"). The Third Circuit recently addressed a legal question similar to that before us when it applied the knowledge requirement of *Ratzlaf* to another statute. *United States v. Curran,* 20 F.3d 560 (3d Cir.1994). With respect to the conspiracy conviction, the court concluded that "[t]he essence of a conspiracy is an agreement to commit an act that is illegal. If the jury is misled into considering as unlawful the omission of an act that the defendant is under no duty to perform, then a finding of conspiracy based on such conduct cannot stand. It follows that the conspiracy count must be vacated." *Id.* at 571.

■ We hold that it is necessary to establish knowledge of the illegality of structuring in order to convict a defendant for conspiracy to structure financial transactions. The district court erred by failing to properly describe the elements of conspiracy to structure in its instructions to the jury. Therefore, the Kims were convicted under an improper legal standard.

### III. Sufficiency of the Evidence

■ The Kims also argue that the evidence presented at trial was insufficient to sustain their conspiracy convictions because there was no evidence presented at trial that demonstrated they knew structuring the transactions was illegal. This argument is inappropriate. We do not examine the sufficiency of evidence of an element that the

Government was not required to prove under the law of our circuit at the time of trial because the Government had no reason to introduce such evidence in the first place. *Weems,* 49 F.3d at 531 (sufficiency of evidence of knowledge not examined when, under law of circuit at time of trial, "government was not required to prove that a defendant knew structuring was illegal") (*citing Hoyland,* 914 F.2d at 1128–30). Accordingly, the proper disposition in this case is to remand for new trial to permit the Government to present its case in accordance with the recent change in law. *Weems,* 49 F.3d at 531.

### IV. Conclusion

The convictions of the Kims are REVERSED and the case is REMANDED to the district court for a new trial on the conspiracy count with a new instruction consistent with this opinion.

REVERSED and REMANDED.